FILED
United States Court of Appeals
Tenth Circuit

July 29, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DIONYSIUS SPENCER FOX,

Defendant-Appellant.

No. 08-2190

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. CR 05-00772-JB-1)**

---

Laura Fashing, Assistant United States Attorney, Albuquerque, New Mexico
(Gregory J. Fouratt, United States Attorney, with her on the brief) for Plaintiff-
Appellee.

Roger A. Finzel, Assistant Federal Public Defender, Albuquerque, New Mexico,
for Defendant-Appellant.

---

Before **McCONNELL**, **HOLLOWAY** and **BALDOCK**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Dionysius Fox, a member of the Navajo Nation, was arrested on the Navajo

Reservation on an unrelated charge and found in possession of a shotgun and a

rifle.  Mr. Fox is a convicted felon, subject to the provisions of 18 U.S.C. § 922(g)(1), which prohibits the possession of firearms by those previously adjudged guilty of felonies.  Although he acknowledges that he is prohibited from possessing firearms beyond Navajo Reservation land, Mr. Fox asserts that he is entitled to possess guns for the limited purpose of hunting on the Navajo Reservation, pursuant to an 1868 Treaty between the United States and the Navajo Nation.  We conclude, however, that Mr. Fox has relinquished any treaty right to use firearms for hunting purposes, and therefore affirm the judgment of the district court.

## I. Background

The facts underlying Mr. Fox's arrest are not under dispute.  In March 2005, Navajo Nation Police found Mr. Fox asleep and intoxicated while in a running vehicle in his sister's driveway.  After arresting Mr. Fox for driving under the influence of alcohol, the police found a double-barrel shotgun and a rifle with a scope under a floorboard in the trunk of the car.  Mr. Fox claimed that he had borrowed the guns from friends in order to hunt.  Mr. Fox had previously been convicted of several felonies, including aggravated assault, resisting arrest, escape, and attempted sexual intercourse without consent.  *See* Aple. Br. 3–4.  Mr. Fox was therefore charged with violating 18 U.S.C. § 922(g)(1), which provides that "[i]t shall be unlawful for any person . . . who has been convicted in

any court of a crime punishable by imprisonment for a term exceeding one year . . . to possess in or affecting commerce, any firearm . . . ."

Although Mr. Fox acknowledged that he would otherwise be prohibited from possessing a firearm on account of his past felonies, he argues that an 1868 Treaty between the United States and the Navajo Nation guarantees him the right to hunt on his reservation. After an evidentiary hearing, the district court denied Mr. Fox's motion to dismiss the indictment or present an affirmative defense based on his alleged treaty right. The court found that "the Treaty of 1868 concerns the Navajo Indian Tribe's right to hunt, not individual Navajo Indians' right to hunt." Dist. Ct. Op. 1. As a result, although the court agreed that 18 U.S.C. § 922(g)(1) did not abrogate the Treaty of 1868, it concluded that imposing criminal liability on Mr. Fox did not conflict with any right protected under the Treaty. Dist. Ct. Op. 11. Following the district court's ruling, Mr. Fox pled guilty pursuant to a plea agreement, while reserving his right to appeal the district court's ruling on his motion to dismiss the indictment or present an affirmative defense. This appeal followed.[1]

## II. Discussion

---

[1]For the first time on appeal, Mr. Fox also argues that 18 U.S.C. § 922(g) violates the Second Amendment. Because Mr. Fox voluntarily and intelligently entered his guilty plea, preserving only an appeal on the basis of his alleged treaty right, he has waived all other non-jurisdictional challenges to his conviction. *See United States v. Wright*, 43 F.3d 491, 494 (10th Cir. 1994).

In order to ascertain whether Mr. Fox might be exempt from prosecution under 18 U.S.C. § 922(g), we must evaluate both whether the Treaty of 1868 conferred a right to hunt on the Navajo Reservation that may be asserted by an individual member of the Navajo Nation and whether Mr. Fox may exercise such a right. We begin with first principles. When a federal law of general applicability is silent on the issue of applicability to Indian tribes, we have explained that it applies equally to Indians unless: "(1) the law touches 'exclusive rights of self-governance in purely intramural-matters'; (2) the application of the law to the tribe would 'abrogate rights guaranteed by Indian treaties'; or (3) there is proof 'by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations . . . .'" *Nero v. Cherokee Nation of Oklahoma*, 892 F.2d 1457, 1462–63 (10th Cir. 1989) (citation omitted). In any of these three situations, we look for a "clear and plain" expression signaling Congress' intention to abrogate Indian treaty rights. *United States v. Dion*, 476 U.S. 734, 738 (1986). Although Congress need not declare its intent to abrogate the treaty right expressly, we will not infer such an intent in the absence of "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Id.* at 740.

Both parties agree that 18 U.S.C. § 922(g) is a law of general applicability which is silent regarding the law's application to Indians. *See* Aplt. Br. 9; Aple.

-4-

Br. 10.  The government also concedes that the felon-in-possession statute itself "does not abrogate the Navajo tribe's right to hunt."  Aple. Br. 7.  Whether application of § 922(g) to Mr. Fox would abrogate rights guaranteed by the 1868 Treaty depends therefore primarily on the scope of the treaty right and Mr. Fox's eligibility to assert it.

*The Scope of Hunting Rights Guaranteed by the Treaty of 1868*

The Supreme Court has noted that Indians "enjoy exclusive treaty rights to hunt . . . on lands reserved to them, unless such rights were clearly relinquished by treaty or have been modified by Congress."  *United States v. Dion*, 476 U.S. 734, 738 (1986) (citing FELIX COHEN, HANDBOOK OF FEDERAL INDIAN LAW 449 (1982)).  "These rights need not be expressly mentioned in the treaty."  *Dion*, 476 U.S. at 738; *see also Menominee Tribe of Indians v. United States*, 391 U.S. 404, 406 & n.2 (1968) (noting that hunting and fishing were "normal incidents of Indian life" and concluding that such rights were reserved by treaty even though "[n]othing was said in the 1854 treaty about hunting and fishing rights").  Article II of the Treaty of 1868 provides that the land making up the Navajo Reservation "is hereby, set apart for the use and occupation of the Navajo tribe of Indians."  Treaty Between the United States of America and the Navajo Tribe of Indians, Aug. 12, 1868, 15 Stat. 667 ("Treaty of 1868").  We view this general language as sufficient to indicate that the Treaty of 1868 preserved for the Navajo Nation the right to hunt on reservation lands.

-5-

Although the government agrees that the Treaty of 1868 codified the Navajo *tribe's* right to hunt on the reservation, it argues that hunting rights created by the Treaty of 1868 "belong to the tribe, not to individual members of the tribe." Aple. Br. 7. Both of the other circuits to consider this question in the context of the prosecution of a tribal member pursuant to 18 U.S.C. § 922(g) have reached the same conclusion. In *United States v. Three Winchester 30-30 Caliber Lever Action Carbines*, 504 F.2d 1288 (7th Cir. 1974) (hereinafter "*Three Carbines*"), the Seventh Circuit found that a convicted felon, a Menominee Indian, was not exempt from prosecution under a predecessor statute to § 922(g) even though he allegedly possessed weapons for the purpose of hunting on lands to which his tribe retained hunting rights by treaty. The court determined that "[t]he treaty rights allegedly abridged belong to the tribe as a whole and not to any one individual." *Id.* at 1292. As a result, the court concluded that by enforcing the felon-in-possession statute, "the government has not made the exercise of a treaty right illegal, but rather the defendant's own actions have limited him from participating fully in his tribe's hunting rights." *Id.* (emphasis added). For similar reasons, the Ninth Circuit upheld a Colville Indian's conviction under § 922(g) in *United States v. Gallaher*, 275 F.3d 784, 788–89 (9th Cir. 2001). Relying largely on *Three Carbines*, the court reasoned that "Gallaher lost his right as a Colville Indian to hunt by committing felony crimes." *Id.* at 789.

We are skeptical of the position that hunting rights guaranteed by treaty only benefit the tribe collectively, as opposed to its individual members. To be sure, "[t]he very great majority of Indian treaties create tribal, not individual, rights." *Dry v. United States*, 235 F.3d 1249, 1256 (10th Cir. 2000) (quoting *Hebah v. United States*, 428 F.2d 1334, 1337 (Ct. Cl. 1970)). But while such treaties are the product of negotiations with tribes as collective entities, there can be little doubt that they endow individual tribal members with rights and responsibilities. As the Supreme Court commented in *McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 181 (1973), "[w]e cannot accept the notion that it is irrelevant whether [the law] infringes on (appellant's) rights as an individual Navajo Indian . . . . To be sure, when Congress has legislated on Indian matters, it has, most often, dealt with the tribes as collective entities. But those entities are, after all, composed of individual Indians, and the legislation confers individual rights." (quotation and citation omitted). Over one hundred years ago, when addressing the applicability to individual Indians of fishing rights preserved by a treaty between the United States and the Yakima Nation, the Supreme Court explained:

> [T]he treaty [creating a reservation] was not a grant of rights to the Indians, but a grant of right from them—a reservation of those not granted . . . . Reservations were not of particular parcels of land, and could not be expressed in deeds, as dealings between private individuals. The reservations were in large areas of territory, and the negotiations were with the tribe. *They reserved rights, however, to every individual Indian, as though named therein.*

-7-

*United States v. Winans*, 198 U.S. 371 (1905) (emphasis added); *see also Mason v. Sams*, 5 F.2d 255, 258 (W.D.Wash. 1925) ("The treaty was with the tribe; but the right of taking fish at all places within the reservation, and usual and accustomed grounds and stations outside the reservation, was plainly a right common to the members of the tribe—*a right to a common is the right of an individual of the community*.") (emphasis added).

Accordingly, while acknowledging "[t]he right to hunt and fish on reservation land is a long-established tribal right," we have long recognized that "[i]ndividual Indians . . . enjoy a right of user in the tribe's hunting and fishing rights." *United States v. Felter*, 752 F.2d 1505, 1509 (10th Cir. 1985). The right of user in a tribal right to hunt or fish confers "a personal right" upon which an individual member of the tribe may rely. *Hackford v. Babbit*, 14 F.3d 1457, 1467 (10th Cir. 1994). Likewise, the Supreme Court has explicitly held that such hunting treaty rights "can be asserted by . . . an individual member of the Tribe." *Dion*, 476 U.S. at 738 n.4. We therefore agree with Mr. Fox that the Treaty of 1868 guarantees hunting rights that may be asserted by individual Navajos.

<u>*Mr. Fox's Eligibility to Assert a Treaty Right*</u>

Although we find that individual Navajos may assert their treaty-guaranteed hunting rights as a general matter, this does not make Mr. Fox eligible to do so. Convicted felons—even those whose terms of imprisonment have been completed—are often subject to legal obligations and restrictions that differ from

-8-

those of the general population. *See Green v. Berge*, 354 F.3d 675, 680 (7th Cir. 2004) (Easterbrook, J., concurring). "A broad range of choices that might infringe [even one's] constitutional rights in free society fall within the expected conditions . . . of those who have suffered a lawful conviction." *McKune v. Lile*, 536 U.S. 24, 36 (2002). Persons convicted of felonies often lose the right to serve on juries, to vote, and of course, the right to possess firearms. *See* Margaret H. Lemos, *The Commerce Power and Criminal Punishment: Presumption of Constitutionality or Presumption of Innocence*, 84 Tex. L. Rev. 1203, 1235 (2006). If citizens may forfeit their most precious constitutional rights by commission of a felony, it is not surprising that members of Indian tribes may similarly forfeit important treaty rights.

Thus, contrary to Mr. Fox's assertions, the Treaty of 1868 does not insulate him from the consequences of his criminal activity. Indeed, the treaty itself provides that members of the Navajo Nation who commit crimes forfeit privileges as a result of their actions. Article I of the Treaty stipulates that "[i]f bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States . . . the Navajo tribe agree that they will . . . deliver up the wrongdoer to the United States, *to be tried and punished according to its laws*." (emphasis added). The implication seems clear that both signatories to the Treaty

envisioned that members of the Navajo Nation committing crimes would lose certain rights under the treaty.

If we were to read the treaty right as Mr. Fox asks us to, it is hard to see how any Navajo could be convicted of *any* federal crime of general applicability. Incarceration in federal prison is obviously incompatible with a number of treaty rights: the right to live in the Navajo reservation (Article II), the right to commence farming (Article V), and of course, the right to hunt. Mr. Fox's claim is essentially that any federal law restricting his ability to hunt on the Navajo reservation cannot apply to him in the absence of "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other." *Dion*, 476 U.S. at 740. But any federal criminal laws resulting in incarceration have the effect of restricting the malefactor's ability to hunt. It surely is not the case that Navajos are immune from prosecution for fraud, drug offenses, antitrust violations, insider trading, or any other number of federal crimes by virtue of the fact that the United States guaranteed hunting rights to their tribe.

When Congress passed 18 U.S.C. § 922(g)(1) and its predecessors, it affixed a collateral regulatory consequence to all felony convictions as if it had amended each felony individually. Just as Mr. Fox lost the opportunity to hunt while physically incarcerated as a result of his conviction, 18 U.S.C. § 922(g)(1) prevents Mr. Fox from hunting with firearms as though it was explicitly part of

his sentence for his earlier felonies. All of Mr. Fox's felony convictions post-date the enactment of the rule; thus, it was well-established on the date that he committed each of his felonies that a conviction would carry repercussions including the loss of his right to possess firearms. Notwithstanding the existence of this rule, Mr. Fox committed several felonies against persons subject to the authority of the United States. *See* Presentence Report 8, 11, 13 (describing Mr. Fox's convictions for attempted sexual intercourse without consent, aggravated assault, and attempted aggravated assault). As the treaty itself envisioned, the United States was free to "punish[] [Mr. Fox] according to its laws." Treaty of 1868, Article I.

## III. Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the district court.